**EDUCATIONAL TESTING SERVICE, Plaintiff,**

v.

**TOUCHSTONE APPLIED SCIENCE ASSOCIATES, INC., Defendant.**

**No. 90 Civ. 2985 (GLG).**

United States District Court, S.D. New York.

June 6, 1990.

White & Case, New York City (Lile H. Deinard, of counsel), for plaintiff.

Leo Zucker, White Plains, N.Y. (Leo Zucker, of counsel), Goodstein & West, New Rochelle, N.Y. (Eileen West, of counsel), for defendant.

## OPINION

GOETTEL, District Judge:

The plaintiff, Educational Testing Service, Inc. ("ETS"), seeks a preliminary injunction against defendant Touchstone Applied Science Associates, Inc. ("TASA") enjoining it from using an allegedly infringing trademark pending a trial on the merits of the plaintiff's trademark infringe-

ment action. The relevant facts are as follows.

## I. FACTS

Prior to 1987, ETS undertook the development of a reading program that would encourage children to read and help them select books to their liking. In 1987, ETS introduced a computer-based reading program bearing the trademark BOOKWHIZ. In 1989, ETS obtained federal trademark registration for BOOKWHIZ and BOOK-WHIZ and design.[1]

On October 2, 1989, the defendant's president, Dr. Bertram L. Koslin, presented a paper at a meeting of the College Board which introduced "two whole language programs, Browzer and its companion, Bookwize." Affidavit of Janet Williams, Ex. G at 1. BROWZER is a computerized card catalog that "helps students find suitable materials to read for different purposes." *Id.* at 4.[2] BOOKWIZE is a series of journals "that contain activities that guide students through reading and writing processes that will enhance comprehension." *Id.* at 5.

In April 1990, ETS learned that the defendant was coming to market with BOOK-WIZE. On May 4, 1990, the plaintiff commenced this action asserting claims of federal trademark infringement, 15 U.S.C. § 1114(1) (1988), federal unfair competition and false designation of origin, 15 U.S.C. § 1125(a) (1988), common law trademark infringement and unfair competition, deceptive practices under New York Gen. Bus.Law § 349 (1988) and dilution under New York Gen.Bus.Law § 368–d (1984). The plaintiff, on the same date, filed an order to show cause seeking an order temporarily restraining the defendant from introducing BOOKWIZE at an International Reading Association convention in Atlanta Georgia on May 7, 1990. Temporary relief was denied on May 4, 1990 and a hearing was held on the plaintiff's motion for a preliminary injunction on May 11, 1990.

## II. PRELIMINARY INJUNCTION STANDARD

The standard for granting preliminary injunctive relief in this circuit is well settled. To justify the issuance of an injunction, the plaintiff must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

## III. LANHAM ACT, COMMON LAW TRADEMARK AND COMMON LAW UNFAIR COMPETITION CLAIMS

The plaintiff has asserted two separate claims under the Lanham Act; one under section 32 for trademark infringement, 15 U.S.C. § 1114 (1988), and one under section 43 for false designation of origin. 15 U.S.C. § 1125 (1988). "[I]n either a claim of trademark infringement under § 32 or a claim of unfair competition under § 43, a prima facie case is made out by showing the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986). The same analysis governs the plaintiff's common law trademark and unfair competition claims. *See Andy Warhol Enter., Inc. v. Time, Inc.*, 700 F.Supp. 760, 673 (S.D.N.Y.1988); *Eli Lilly & Co. v. Revlon, Inc.*, 577 F.Supp. 477, 482 (S.D.N.Y. 1983). Thus, our inquiry into the plaintiff's likelihood of success on the merits of these

---

1. The BOOKWHIZ and design trademark registration was issued on February 7, 1989 and the BOOKWHIZ trademark registration was issued on December 19, 1989.

2. The plaintiff's causes of action are not based on the defendant's BROWZER product. Indeed, we are told by defendant's counsel that BROWZ-ER was available to the consuming public before the plaintiff introduced BOOKWHIZ. The attributes of the BROWZER product, however, are relevant to the extent that BROWZER and BOOKWIZE are sold as companion products. *See infra.*

claims begins with an analysis of the likelihood of confusion as to the source of the two products. *See Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 213 (2d Cir. 1985); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

█ The well-known test for determining likelihood of confusion was enunciated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

> Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 495. We will consider each factor in turn.

### A. *Strength of the Mark*

█ The strength of a mark is its tendency to identify goods sold as radiating from a particular source. *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 491 (2d Cir.1988) (quoting *McGregor–Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)). A determination of the strength of a mark can be facilitated by placing the trademark into one of four categories. As set forth in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976), those categories, ranging from least to most protective, are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.

█ The plaintiff contends that the mark BOOKWHIZ is arbitrary as applied to its computer-based reading program. In contrast, the defendant contends that the "whiz" suffix is commonly used among computer software disk producers and entitled to little protection. It is clear that the term is not generic; it certainly suggests more than a genus or species. *Id.* A descriptive mark is one that "conveys an immediate idea of the ingredients, qualities or characteristics" of a product. *Id.* at 11. We think it takes further thought to reach the conclusion that BOOKWHIZ is a computerized reading tool. Although the mark may be less than arbitrary, we find it is suggestive of its product and, as such, entitled to protection. *See Stix Prods. Inc. v. United Merchants & Mfrs. Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968) (suggestive mark one which "requires imagination, thought and perception to reach a conclusion as to the nature of the goods").

### B. *Similarity of the Marks*

█ In examining the similarity of the marks, the court looks to "the general impression conveyed to the purchasing public by the respective marks." *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985). BOOKWHIZ and BOOKWIZE are very similar marks. Like "POLAROID" and "POLARAD," the two marks contain the same prefix and a similar suffix, utilizing only a different vowel sound. *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Moreover, both trademarks use the letter "Z." While the use of a "Z" is appropriate in the word "whiz,"[3] its use in the word "wise" is clearly an improper spelling. Thus, by using the letter "Z" in its trademark, the defendant has created a greater similarity between the two marks.[4]

The defendant contends, however, that the trademarks convey different meanings.

---

**3.** *Webster's Dictionary* contains alternate spellings of "whiz" or "whizz" and defines the word as "to hum, whir, or hiss like a speeding object," or synonymous to "wizard." *Webster's Ninth New Collegiate Dictionary* 1346 (1984).

**4.** The defendant explains its decision to use the letter "Z" in BOOKWIZE as an attempt to link it with its BROWZER software. This tends to undermine the defendant's argument that BROWZER is completely irrelevant to these proceedings and should not be considered in evaluating the likelihood of confusion. *See infra.*

Specifically, the defendant argues that BOOKWIZE suggests someone who is smart and gets smarter by using the materials. The defendant contends that BOOKWHIZ, on the other hand, implies something that is quick and easy to use. The defendant ignores the alternate definition of whiz which is akin to wizard. Indeed, the characterization "whiz kid" or "computer whiz" brings to mind a precocious, intelligent child, not merely one who accomplishes things quickly.[5] Thus, the defendant's use of "WIZE" and the plaintiff's use of "WHIZ" convey much the same impression. In sum, we find a great similarity between the trademarks.

### C. *Proximity of the Products*

We now consider the proximity or similarity of the products. The defendant has taken great pains to emphasize the differences between BOOKWHIZ and BOOKWIZE and we will recount them here.

| BOOKWHIZ | BOOKWIZE |
| --- | --- |
| Computer program; non-consumable product. | Paperback workbook; consumable product. |
| Independently used in library or reading room. | Used most often in classroom setting although it could be used independently. |
| Used by student to choose a book of his or her liking by identifying preferred subjects and recommending book titles and providing short synopses. | Used by student to choose a book of his or her liking by identifying preferred subjects. Aids student in comprehending and reporting on reading material. |
| Ordinarily ordered by a librarian from library budget. | Ordinarily ordered by a teacher from classroom budget. |
| Vendor identified as Educational Testing Services. | Vendor identified as Touchstone Applied Science Associates. |
| Costs approximately $200.00 per disk set. | Costs approximately $12.00 per book. |

The primary distinction between the two products is the way in which the products are used. At oral argument on May 11, 1990, a demonstration of the two products was given. BOOKWHIZ simulates a computer game by asking the reader a series of questions designed to identify the reader's interests. The user answers the questions by choosing among computer-generated, multiple choice answers. Through this series of questions and answers, the user "writes" a story that reflects his or her interests. At the completion of the story-writing phase, the computer generates a list of book titles that match the user's interests and preferences.[6] The book titles are accompanied by annotations that describe the listed book and suggest other books by the same author or with similar themes that may be of interest to the reader. The program is divided into three categories for different age groups and takes approximately five to ten minutes to complete.

The BOOKWIZE system also begins by helping the student select the types of books he or she would like to read. Presented in a workbook format, the first section of BOOKWIZE poses a number of questions which, if answered in the affirmative, direct the user to a particular category of literature.[7] BOOKWIZE then in-

---

**5.** *Webster's Dictionary* defines "whiz kid" or "whizz kid" as "a person who is unusually intelligent, clever, or successful esp. at an early age." *Webster's Ninth New Collegiate Dictionary* 1347 (1984).

**6.** The categories included in BOOKWHIZ are: adventure; biography; historical fiction; growing up; mysteries; popular books; romance; science fiction; sports; humor; and animal stories.

**7.** The categories included in BOOKWIZE are: adventure; animals and plants; arts and crafts; fantasy and folktales; geography and culture; history and government; home, family and everyday life; mystery; nature; people; religion and philosophy; romance; science fiction;

structs the reader on choosing a particular book. Specifically, it explains how to skim a book to see if it is to your liking. Once a book has been selected [8] and read by the student, the workbook series helps the student analyze what he has read, helps him use words he has seen for the first time in his reading and helps him write about and discuss the books he has read. BOOK-WIZE is also grouped into three levels.

There are obvious differences between the two products. That much is clear. What is equally clear, however, is that there is sufficient overlap between BOOK-WHIZ and BOOKWIZE to make them market competitors. "To establish likelihood of confusion, competing goods require less proof under the *Polaroid* factors than noncompetitive items." *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir.1988). Although the products take different formats and may cover different areas, they both have the same goal, *i.e.*, promoting reading, and the same target audience, *i.e.*, school-aged children. They both take the same initial approach of identifying children's interests by engaging them with a series of questions. When the interplay of defendant's BROWZER program is considered, the parallels only increase. We conclude that the similarities between BOOKWHIZ and BOOKWIZE outweigh their differences.

### D. *Bridging the Gap*

This factor examines "whether the senior user of the mark is likely to enter the market in which the junior user is operating." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir.1987). The plaintiff has alleged that it currently plans to expand the BOOKWHIZ program to include additional reading and writing enrichment materials that would include teacher/student activities and classroom projects. This plan, if realized, would bridge whatever gap exists between the plaintiff's reading and the defendant's reading/writing pro-

grams. The plaintiff's intention to bridge the gap "helps to establish a future likelihood of confusion as to source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 874 (2d Cir.1986).

### E. *Actual Confusion*

This element is inapplicable in the present case because, as of the time of hearing on this matter, the defendant's product had not yet entered the stream of commerce. No evidence of confusion, therefore, was available. Consequently, this factor weighs in favor of neither party.

### F. *Junior User's Bad Faith*

In the Second Circuit, proof of actual knowledge of the senior user's trademark can give rise to an inference of bad faith. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1228 (2d Cir.1987). At oral argument, Dr. Bertram Koslin, president of the defendant corporation, represented that he was aware of the plaintiff's BOOKWHIZ product at the time he named his product BOOK-WIZE. This admission, coupled with the unusual use of the letter "Z" in BOOK-WIZE, give rise to at least a preliminary inference of bad faith. Although it may ultimately be demonstrated that the defendant acted only with the best intentions, for the purposes of deciding this motion, we are persuaded by the plaintiff's allegations and the defendant's admissions.

### G. *Quality of the Junior User's Product*

There is no suggestion that the defendant's product is of an inferior quality. Indeed, our examination of the two products leads us to conclude that the products are similar in quality. When the quality of competing products is comparable, however, can actually increase the likelihood of confusion as to source. *See Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir.1988); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986). Thus, this factor too

---

science and technology; and sports and hobbies.

**8.** This is where the defendant's BROWZER computer program comes into play. After selecting

a category of interest, the student could search for book titles with BROWZER by searching book listings grouped by interest area, author, title or book awards.

leads to a conclusion of likelihood of confusion.

### H. *Sophistication of the Consumers*

The final *Polaroid* factor examines the sophistication of the consumers. The parties apparently agree that the purchasers of the two products, teachers and school administrators, are sophisticated consumers. This fact generally cuts against a finding of likelihood of confusion. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1228 (2d Cir.1987). When both the products and their trademarks are similar, however, even a sophisticated purchaser may be confused as to source. *See McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1137 (2d Cir.1979). Additionally, the ultimate consumers of the products, schoolchildren, are likely not sophisticated enough to differentiate between the two different manufacturers. *Cf. United States v. Hon,* 904 F.2d 803, 806 (2d Cir.1990) (confusion analysis includes confusion to non-purchasing public). Thus, we conclude that this factor supports the plaintiff's claim of likelihood of confusion.

### I. *Conclusion as to Likelihood of Confusion*

As stated by Judge Edelstein in *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 702 F.Supp. 1031 (S.D.N.Y. 1988), *rev'd on other grounds,* 875 F.2d 1026 (2d Cir.1989):

> The question of likelihood of confusion is always one that is unique to each set of facts. The court must determine whether, in light of the facts, the use of defendant's mark is likely to cause confusion among the consuming public as to the origin or source of the goods in question.

*Id.* at 1039. In light of all of the factors heretofore discussed, we think that the plaintiff has demonstrated a likelihood of success on the merits of its Lanham Act and common law trademark and unfair competition claims. There are sufficient similarities between the parties' products, trademarks and body of consumers to conclude that there is a likelihood of confusion as to the source of the respective products.[9]

## IV. IRREPARABLE HARM

In addition to a finding of likelihood of success on the merits, a preliminary injunction is warranted only if the plaintiff can demonstrate that it stands to suffer irreparable harm if the preliminary injunction does not issue. "Because of the trademark's unique function in representing intangible assets such as reputation and good will, however, and the consequent difficulties in measuring its value, irreparable injury will almost always be found when there is a high probability of confusion, as established in this case." *Playboy Enter., Inc. v. Chuckleberry Publishing, Inc.,* 486 F.Supp. 414, 429 (S.D.N.Y.1980), *aff'd,* 687 F.2d 563 (2d Cir.1982). Although any damages suffered by the plaintiff due to lost sales may ultimately be recompensed in money damages, it is impossible at this point to predict the extent of the plaintiff's potential injury. Moreover, any future injury to reputation and good will cannot be so easily quantified. For all these reasons, we conclude that the plaintiff has established irreparable harm.

## V. CONCLUSION

For all of the foregoing reasons, the plaintiff's motion for a preliminary injunction is granted.[10] The plaintiff will submit an order.

SO ORDERED.

---

**9.** It should be noted that our finding of likelihood of success on the merits is founded on a strictly legal basis without the benefit of a full evidentiary hearing. Upon a full trial on the merits, a contrary result could be reached. *See Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 969 (2d Cir.1981) (despite possible likelihood of confusion as to source of goods, balance of equities in favor of junior user justifies denial of injunctive relief).

**10.** Having granted the plaintiff's motion on the Lanham Act and common law unfair competi-

tion and trademark claims, we need not address the likelihood of success of the plaintiff's re- maining state law claims.