CHRYSLER CORPORATION, a Delaware Corporation, and Automobili Lamborghini SPA, an Italian Corporation, Plaintiffs,

v.

NEWFIELD PUBLICATIONS, INC., Defendant.

No. 93 CV 73866–DT.

United States District Court, E.D. Michigan, Southern Division.

April 3, 1995.

**506**

R. Terrance Rader, Dykema Gossett, Bloomfield Hills, MI, for plaintiffs.

John J. Ronayne, III, Detroit, MI, for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiffs Chrysler Corporation and Automobili Lamborghini brought this action against Defendant Newfield Publications, seeking damages and an injunction against further infringement of their registered trademarks and trade dress. Chrysler and Lamborghini claim that Newfield's use of their trademarks and trade dress in *Wheels and Wings,* allegedly a collectible card series, constitutes trademark infringement in violation of 15 U.S.C. § 1114, unfair competition in violation of § 1125(a), and trademark infringement and unfair competition under Michigan law. Newfield claims that *Wheels and Wings* is a book, not a collectible card series, and has asserted several affirmative defenses, including First Amendment protection. The matter now comes before this Court on the parties' cross-motions for summary judgment. For the reasons stated below, this Court concludes that Plaintiffs have established on the undisputed facts of record that Defendant's product has created a likelihood of confusion sufficient to entitle Plaintiffs to judgments of trademark infringement, Lanham Act violations, and Michigan unfair competition law violations, were it not for several affirmative defenses which could not be resolved on these motions. Questions of fact remain as to Defendant's affirmative defenses (excepting the claim of nominative fair use) sufficient to require trial of the question whether those affirmative defenses protect it from liability. The only count or claim in this case which is susceptible to entry of summary judgment, accordingly, is Defendant's claim of nominative fair use, on which the Court grants summary judgment to Plaintiffs.

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the moving party demonstrates that there is no genuine dispute as to any material fact, and that the undisputed facts of record require that judgment enter, as a matter of law, for the movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A party opposing a summary judgment motion must show more than "metaphysical doubt" as to the material facts. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1480 (6th Cir.

1990). "A dispute about a material fact is 'genuine' only if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Elvis Presley Enterprises v. Elvisly Yours, Inc.,* 936 F.2d 889, 893 (6th Cir.1991) (*quoting Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.) To survive a motion for summary judgment, the non-movant must demonstrate that there is some dispute of fact as to "an element essential to that party's case, and on which that party will bear the burden of proof at trial...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The "burden on the moving party may be discharged by ... pointing out to the district court ... that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. In making such a determination, this court will examine any evidence in a light most favorable to the non-moving party. *See Boyd v. Ford Motor Company,* 948 F.2d 283, 285 (6th Cir.1991).

### FACTS

Plaintiffs manufacture automobiles, including the Dodge Viper, the Plymouth Slingshot, the Lamborghini Countach, and the Jeep Sahara. They have registered trademarks in their automobiles' names, and claim that their vehicles' designs and images constitute trade dress. Additionally, Plaintiffs extensively license and produce various products displaying their trade marks and trade dress, including posters, t-shirts, calendars, decals and collectible cards. Plaintiffs contend that Newfield's product, *Wheels and Wings,* is an infringing collectible card series that directly competes with products licensed by Plaintiffs.

Newfield publishes books, periodicals, and entertainment programs, and in 1987, Newfield acquired Field Publications, which produced the *Wheels and Wings* series. Newfield contends that the product is a children's continuity series, or a "book in parts". This means the young person begins with binders and dividers, receives unnumbered cards or "pages"[1] each month by mail, and assembles the book himself, so as to make reading more

interesting. *Wheels and Wings* is registered in the Patent and Trademark Office ("P.T.O.") as a "book in parts".

*It* is a collection of 7″ by 10″ cards, which are stored in two 3–ring binders. Approximately twelve cards display Plaintiffs' vehicles and marks. Each card in the series displays 4–color photographs of a vehicle on the front, with the vehicle's name prominently printed (sometimes in the manufacturer's distinctive lettering) at the top. The front of each card in the series includes some text describing the vehicle's performance. The back of each card generally contains statistics, and may include some historical information. Some cards indicate the source of the photographs displayed, and contain language such as "Photo: courtesy Chrysler."

*Wheels and Wings* is available by subscription only. A subscriber to the series initially receives the two 3–ring binders, dividers, a sample deck of cards, and a preview deck. If the subscriber decides to keep the preview deck, she will become enrolled in the program. Thereafter, a shipment of two decks of cards will arrive every month for eighteen months. Although there are 36 decks in all, a subscriber is under no obligation to complete the set, and may cancel after four shipments.

In 1987, Newfield's predecessor in interest, Field Publications, entered into a contract with Mega–Books, Inc. to research, write, and design the *Wheels and Wings* cards. In the contract, Mega–Books warranted that it would obtain any necessary licenses or permission to use text and photographs. Adam Schmetterer, Research Director for Mega–Books, has attested that he contacted Anne Lalas at Plymouth Public Relations in 1989. He recalls telling Lalas that he was gathering information for a children's book series for reluctant readers called *Wheels and Wings.* Schmetterer also stated that he described the format of the *Wheels and Wings* product to Lalas, explaining it as a card continuity series. Additionally, Schmetterer stated that Tom Kowaleski, Director of Product Platform and Technology Public Relations, sent him photographs and information.

---

**1.** This Court will use the term "cards" for the sake of convenience.

Newfield has produced evidence that Chrysler public relations employees mailed packages to Schmetterer in 1989.

The parties are in dispute as to communication, however. Neither Lalas nor Kowaleski recall ever speaking with Schmetterer. Lalas testified that she actually left Plymouth to join Dodge in 1988, one year before Schmetterer claims that he contacted her. Further, Lalas states that she moved to Germany in August, 1989, to become manager of public relations for Chrysler of Europe.

While Mega–Books was responsible for researching and designing the *Wheels and Wings* cards, Newfield marketed the product. Newfield advertised the series in several publications, including *Weekly Reader, Disney Adventures,* and *Nintendo's Legend of Zelda.* Newfield also attempted to advertise *Wheels and Wings* in *Topps,* a collectible card trade magazine. However, apparently, the advertisement never ran. In these magazines, Newfield promoted a special *Wheels and Wings* introductory program. The advertisement read: "30 Giant Collector Cards for only $0.99!" Other advertisements contained text such as "Introducing *Wheels and Wings,* a new line of Giant Collectible 'Dream Machine Cards'—like the Lamborghini Countach …"

Another marketing technique Newfield employed was telephone solicitation. Newfield provided a script for its telemarketers, which prescribes the following response to a parent who claims that her child already has too many books: "[I]t's great to hear that your son likes reading, but you should know that *Wheels and Wings* is not a book. It's a series of collectible cards that fit into a 3–ring binder to form a collection of the world's most fascinating cars and planes."

Newfield conducted a focus group for *Wheels and Wings* in November, 1992. Ten boys between the ages of 8 and 12 participated. The boys' parents completed a questionnaire. The results indicated that seven out of the nine parents viewed the *Wheels and Wings* program as collectible cards. The focus group results indicated that the boys were sports card collectors who spent their allowances on cards and games.

The marketing department surveyed program subscribers to gauge the success of the product, and determine which aspects of the series most appealed to parents and children. An internal memorandum discussing survey results reported: "Sports cars and race cars were the favorite 'Wheels' categories and proportionally more cards should be developed in these areas." The Lamborghini card was the most popular among the survey respondents. The memorandum noted: "The high ranking of the Lamborghini card indicates it may lift fron[t] end if it replaces Bigfoot in the parent direct mail promotion."

Plaintiffs brought this suit in 1993. The parties engaged in extensive discovery. Newfield presented deposition testimony of several employees in support of its proposition that *Wheels and Wings* is a book designed to stimulate reluctant readers, not a collectible card series. Plaintiffs retained and deposed Michael Berkus, an expert on the collectible card industry. In Berkus' opinion, *Wheels and Wings* is a collectible trading cards series. He based his opinion on the manner in which Newfield advertised *Wheels and Wings* and the appearance of the product. Berkus further described the collectible card industry as very diverse, and noted that "oversize" cards were a new trend. Regarding sponsorship, Berkus indicated that the public would simply assume that the manufacturers authorized these collectible cards, especially given that some cards contained the words "Photo: Courtesy Chrysler."

## ANALYSIS

### A. Statutory Trademark Infringement and Unfair Competition

Chrysler and Lamborghini allege that Newfield's use of their marks in the *Wheels and Wings* series constitutes trademark infringement in violation of 15 U.S.C. § 1114. The test for trademark infringement in this circuit is "whether the alleged infringement of a trade or service mark causes a 'likelihood of confusion' among consumers." *Wynn Oil Co. v. Thomas,* 839 F.2d 1183,

1186 (6th Cir.1988).[2] "The general concept underlying likelihood of confusion is that the public believes that the mark's owner sponsored or otherwise approved of the use of the trademark." *Id.* at 1186.

Plaintiffs also claim that Newfield engaged in unfair competition. Statutory trademark law prohibits unfair competition, meaning the use of any "false designation of origin," "misleading description," or "misleading representation[3]". 15 U.S.C. § 1125(a) The test for unfair competition under § 1125(a) is identical to that for trademark infringement under 15 U.S.C. § 1114, i.e., whether there is a likelihood of confusion.

In *Frisch's Restaurants v. Elby's Big Boy, Inc.,* 670 F.2d 642 (6th Cir.1982), the Sixth Circuit enumerated the factors a district court must consider in determining the existence of a likelihood of confusion. They are: (1) the strength of the mark; (2) the relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the likely degree of purchaser care; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines. *Id.* at 648. Chrysler and Lamborghini are not required to prove all of these factors in order to prevail. *Wynn Oil, supra,* at 1186.

## 1. Strength of the Mark

The strength of the mark factor refers to a "mark's distinctiveness and degree of recognition in the marketplace." *Homeowners Group v. Home Marketing Specialists,* 931 F.2d 1100, 1107 (6th Cir.1991). In this case, all parties agree that the marks in question are very strong. Plaintiffs' marks are easily recognized throughout the world, and appear on television commercials, billboards, and various paraphrenalia. Therefore, this factor overwhelmingly favors Plaintiffs.

## 2. Relatedness of the Goods

"The more closely related the plaintiff's and the defendant's goods are, the more probable it is that buyers are likely to be misled or confused into believing that the goods are either from the same source or an affiliated source, or even that the two products are one and the same." Epstein, *Modern Intellectual Property,* § 7.03[B][2] (3d ed. 1995). In determining relatedness of goods, a court should consider whether the competitor's goods compete with the trademark owner's goods. If the goods directly compete, "confusion is likely if the marks are sufficiently similar." *Homeowners Group v. Home Marketing Specialists,* 931 F.2d 1100, 1108 (6th Cir.1991). Newfield maintains that there is little relatedness of the goods, because *Wheels and Wings* is a book, not collectible cards, so there is no competition. In attempting to distinguish its product from collectible cards, Newfield emphasizes the amount of text on each card and the fact that each subscriber receives the same cards, thus eliminating any trading aspect. However, Plaintiffs contend that *Wheels and Wings* is a series of collectible cards which directly competes with collectible cards licensed by Plaintiffs.

It cannot be disputed but that *Wheels and Wings* is highly related to collectible cards licensed by Plaintiffs. It is cards, to be collected in the order desired by the collector, in a binder. It is clear that *Wheels and Wings* competes with collectible cards licensed by Plaintiffs. Newfield repeatedly and consistently marketed *Wheels and Wings* as a series of collectible cards, and

**2.** 15 U.S.C. § 1114 provides in pertinent part: (1) Any person who shall, without the consent of the registrant—(1) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion ... shall be liable in a civil action by the registrant....

**3.** 15 U.S.C. § 1125(a) provides, in pertinent part: "Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device ... or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to ... the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

highlighted the inclusion of Plaintiffs' marks in the product. Telemarketers were instructed to correct parents who referred to the product as a book, and emphasize that it is instead a collectible card series. *Wheels and Wings* cards are delivered in packs of ten, much like traditional collectible cards. Seven out of nine parents in the focus group viewed *Wheels and Wings* as collectible cards. Given the overwhelming evidence on this factor, the court finds that *Wheels and Wings* is highly related to collectible cards licensed by Plaintiffs.

### 3. Similarity of the Marks

The similarity of the marks factor is not disputed, because Newfield has used Plaintiffs' exact marks, as they are registered in the Patent and Trademark Office. Further, because the cards display actual photographs of Plaintiffs' vehicles, Newfield has also copied Plaintiffs' trade dress.[4] Therefore, this factor strongly favors Plaintiffs.

### 4. Evidence of Actual Confusion

■ Chrysler and Lamborghini have failed to produce any evidence of actual confusion, and thus, this factor must favor Newfield. However, the Sixth Circuit has held that evidence of actual confusion is not required: "This fact does not preclude this Court from concluding that there is a 'likelihood of confusion', as actual confusion is merely one factor to be considered...." *Wynn Oil, supra*, at 1188 (quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 914 (Fed.Cir. 1984). Therefore, while this Court recognizes that this factor favors Newfield due to a lack of evidence by Plaintiffs, such a finding is not determinative in the likelihood of confusion analysis.

### 5. Marketing Channels Used

■ The marketing channels used factor involves "considerations of how and to whom the respective goods or services of the parties are sold." *Homeowners Group*, 931 F.2d at 1110. Plaintiffs contend that the market-

ing channels used for the *Wheels and Wings* series were identical to those used for collectible cards. Newfield has emphasized the difference in the marketing channels used, noting that *Wheels and Wings* was sold only by direct mail, rather than in hobby stores or at conventions. Where the parties' customers are similar, the use of dissimilar retail strategies does not preclude a finding of likelihood of confusion. *Dieter v. B & H Industries of Southwest Florida*, 880 F.2d 322, 327 (11th Cir.1989).

The Court finds that this factor favors Plaintiffs. Newfield's description of the marketing channels used is undisputed. Although Newfield chose a different retail outlet for its product, it nonetheless used the same advertising channels, and targeted the same specialized collectible card market. Newfield advertised *Wheels and Wings* in children's magazines as a collectible card series. Newfield attempted to advertise its product in *Topps*, a collectible card magazine. The telemarketing pitch given to parents emphasized that this was a collectible product. Based upon the focus group results, it is clear that Newfield targeted a market of young boys who collected cards. Therefore, the marketing channels used by the parties are similar enough to cause a likelihood of confusion.

### 6. Likely Degree of Purchaser Care/Sophistication

■ A court evaluating the likely degree of purchaser care/sophistication factor would generally assume that the purchaser of the competitor's goods is "the typical buyer exercising ordinary caution." *Homeowners Group*, 931 F.2d at 1111. However, when children are "the ultimate consumers" of a product, they "are not likely sophisticated enough to differentiate between the two different manufacturers." *Educational Testing Service v. Touchstone*, 739 F.Supp. 847, 853 (S.D.N.Y.1990) (finding young consumers' lack of sophistication supported likelihood of confusion, even though actual purchasers of

---

4. The Sixth Circuit has held that a well-known automobile's exterior design and appearance constitutes protected trade dress because that automobile's appearance has acquired "second-

ary meaning". *Esercizio v. Roberts*, 944 F.2d 1235, 1240 (6th Cir.1991). Therefore, Plaintiffs may properly bring this action for infringement of their trade dress.

products were sophisticated adults). In this instance, the consumers of *Wheels and Wings* are young boys between the ages of 8 and 14. Recognizing the established case law and the similarity between the products, the Court finds that the targeted market of consumers is not sophisticated enough to differentiate between Newfield's *Wheels and Wings* and cards licensed by Plaintiffs. Therefore, this factor favors Plaintiffs.

### 7. Defendant's Intent in Selecting the Mark

■ A party's intent in using another party's mark "is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff], *that fact alone may be sufficient to justify the inference that there is confusing similarity.*" *Frisch's Restaurants,* 670 F.2d at 648 (emphasis in original) (*quoting Amstar v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.1980).

Newfield's undisputed evidence of intent, consisting of internal memoranda, clearly demonstrates a commercial intent in selecting Plaintiffs' marks. Newfield conducted surveys to determine which vehicle categories were most appealing to its young consumers. Marketing staff members then recommended production of certain types of cards in proportion to their popularity. Newfield used the Lamborghini mark in promoting its product through magazines, telemarketing and direct mailings. Marketing staff recommended inclusion of the Lamborghini card in the direct mailing precisely because it was so popular with survey respondents. Even drawing all inferences in Newfield's favor, its own internal documents and testimony indicate that Newfield chose Plaintiffs' marks based upon their desirability among members of the targeted market. Given Newfield's clear intent to benefit from Plaintiffs' reputation, this factor must favor Chrysler and Lamborghini.

### 8. Likelihood of Expansion of the Product Lines

"[A] 'strong possibility' that either business may expand [its] business to compete with the other will weigh in favor of finding infringement." *Wynn Oil Co. v. American Way Service Corp.,* 943 F.2d 595, 603 (6th Cir.1991). In this case, the 'possibility' is already a reality, because Plaintiffs have an established presence in the collectible card market, and the Court has found that Newfield's product competes with collectible cards. Therefore, this factor must favor Plaintiffs.

\* \* \* \* \* \*

■ On the undisputed evidence, the *Frisch* factors overwhelmingly support a finding of likelihood of confusion. Plaintiff has amply proven all factors except actual confusion, which is not required. Newfield has not satisfied the summary judgment standard established by the Sixth Circuit in *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1480 (6th Cir.1990), which requires that an opposing party show more than "metaphysical doubt" as to the material facts. Therefore, the Court finds that a likelihood of confusion exists as to sponsorship or endorsement of the *Wheels and Wings* series, and Plaintiffs would otherwise be entitled to judgment as a matter of law on this issue. However, the outcome of Plaintiffs' trademark infringement and unfair competition claims depends, nevertheless, upon whether Newfield's defenses are sustained.

### B. Common Law Trademark and Unfair Competition

"To establish infringement of a registered trademark it need only be shown that an infringer used a reproduction, copy or colorable imitation of the registered mark in a way 'likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods.'" *EMRA Corp. v. Superclips Ltd.,* 559 F.Supp. 705 (E.D.Mich. 1983). The factors to consider in a common law claim are identical to those already considered by this Court under the statutory counts of trademark infringement and unfair competition. However, Plaintiffs' common law claims are also dependent upon the validity of Newfield's defenses.

### C. Affirmative Defenses

Newfield asserts a variety of defenses to Plaintiffs' trademark and trade dress in-

fringement and unfair competition claims, including: (1) nominative fair use; (2) First Amendment; (3) consent; (4) acquiescence; and (5) laches. The Court will address each separately below.

### 1. Nominative Fair Use

A small minority of federal courts outside the Sixth Circuit have held that a defendant's use of a plaintiff's mark purely to describe the plaintiff's product, referred to as "descriptive use" or "nominative fair use," does not constitute trademark infringement.[5] Newfield argues that its use of Plaintiffs' marks constitutes "nominative fair use," and cannot form the basis for a trademark action.

The Ninth Circuit introduced the "nominative fair use" defense in *New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302 (9th Cir.1992). "Nominative fair use," unlike traditional fair use, allows a defendant to use a plaintiff's mark to describe the plaintiff's goods. To be protected under the nominative fair use defense, a commercial user must satisfy the following requirements: (1) The product must not be readily identifiable without the mark; (2) the user must utilize only so much of the mark "as is reasonably necessary to identify the product," and (3) the user cannot do anything "that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *New Kids,* 971 F.2d at 308.

On the undisputed evidence of record, here, this Court must grant summary judgment to Plaintiffs as to nominative fair use. First, this Court is not in a position to adopt the nominative fair use defense, when the Sixth Circuit has not chosen to do so. However, even assuming the viability of this defense, no question of fact has been raised that Newfield satisfies the test. Whereas Plaintiffs' products may not be readily identifiable absent the marks, Newfield fails the second and third elements of the test. New-

field clearly adopted more of Plaintiffs' marks than necessary. The cards prominently display Plaintiffs' marks, occasionally in Plaintiffs' distinctive lettering, and include multiple photographs of Plaintiffs' trade dress. Similarly, Newfield is unable to satisfy the third element. This Court has already determined as a matter of law that Newfield's use of Plaintiffs' trade marks and dress makes confusion as to sponsorship or endorsement likely. Newfield's use of Plaintiffs' marks in telemarketing, advertisements, and direct mailings only exacerbates the suggestion that Plaintiffs sponsored or endorsed Newfield's product. Therefore, this Court grants Plaintiffs' motion and denies Defendant's motion as to this defense.

### 2. First Amendment

"Movies, plays, books and songs are all indisputably works of artistic expression and deserve protection." *Rogers v. Grimaldi,* 875 F.2d 994, 997 (2d Cir.1989). Newfield asserts a First Amendment defense, arguing that it used Plaintiffs' marks in an artistic work. The court has determined that *Wheels and Wings* is "highly related" to collectible cards, but cannot make the factual determination whether or not it is a book. Newfield has presented evidence indicating that *Wheels and Wings* may have an educational component, and has presented post-litigation testimony that it is a "book in parts." Although Plaintiffs have presented considerable evidence that *Wheels and Wings* is a commercial collectible card series, entitled to minimum First Amendment protection, it is the factfinder's role, not the court's, to determine that *Wheels and Wings* is not a book. Therefore, summary judgment on this defense must be denied as to both Plaintiffs and Defendant.

### 3. Consent

Newfield asserts that Plaintiffs consented to the use of their marks in the

---

5. The leading cases employing such a "descriptive use" analysis are *New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302 (9th Cir.1992) (holding newspaper's use of Plaintiffs' mark in conjunction with 900 number was not infringement); *WCVB–TV v. Boston Athletic Association,* 926 F.2d 42 (1st Cir.1991) (holding tele-

vision station's use of words "Boston Marathon" to advertise subject of upcoming story was not confusing); and *Pirone v. MacMillan, Inc.,* 894 F.2d 579 (2d Cir.1990) (holding that defendant's use of photographs of Babe Ruth in calendar did not constitute trademark infringement where Plaintiff had no trademark rights in his image).

*Wheels and Wings* series. Lalas and Kowaleski, both public relations personnel, allegedly provided photographs to Schmetterer for use in *Wheels and Wings*. Lalas and Kowaleski do not recall speaking with Schmetterer or sending him photographs. Plaintiffs argue that if Schmetterer did indeed speak with Lalas, *Wheels and Wings* was improperly represented as a children's book, not a collectible card series. This dispute requires a fact-finder's evaluation of credibility, and thus summary judgment is improper, and therefore denied.

### 4. Acquiescence

Acquiescence requires "conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." *Elvis Presley Enterprises v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir.1991) (*quoting Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir.1984) (citations omitted)). As discussed previously, genuine issues of material fact exist as to Plaintiffs' possible acquiescence. Therefore, summary judgment as to this defense must be denied.

### 5. Laches

■ Newfield asserts the defense of laches. "Laches is a negligent and unintentional failure to protect one's rights." *Elvis Presley Enterprises v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir.1991). See also Callmann, *Unfair Competition, Trademarks and Monopolies*, § 19.64 (4th ed. 1993). Plaintiffs claim that they were unaware of Newfield's use of their mark until 1993. However, Newfield argues that Plaintiffs have been aware of the project since 1989, because Schmetterer allegedly contacted Chrysler public relations personnel, and fully described the format of the *Wheels and Wings* series. There are material issues of fact as to when Plaintiffs knew of Newfield's use of its marks. Consequently, summary judgment for Plaintiffs on this defense must be denied.

\*  \*  \*  \*  \*  \*

This Court is not prepared to grant summary judgment on Newfield's affirmative defenses. Numerous issues of material fact exist regarding whether Plaintiffs consented or acquiesced to the use of their marks, laches, and the extent of First Amendment protection, if any, to which Newfield is entitled. Therefore, even though likelihood of confusion exists as a matter of law, the Court cannot determine at this time whether Newfield's use constituted trademark infringement or unfair competition under statutory or common law.

Now, therefore;

IT IS ORDERED that a Partial Summary Judgment is GRANTED for Plaintiffs as to Defendant's affirmative defense of nominative fair use. Summary judgment in all other respects is denied, as material questions of disputed fact have been presented in Defendant's affirmative defenses. The case will be set for trial.

SO ORDERED.